IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SERGEI PORTNOY,
ELENA PORTNOY, et al.,

      Plaintiffs,                            No. CIV S-08-1366 GGH PS

      vs.

CITY OF DAVIS, et al.,                          ORDER

      Defendants.

_____/

I. INTRODUCTION

      This action, which plaintiffs initiated proceeding pro se, has been referred to the undersigned pursuant to the parties' consent to proceed before a United States Magistrate Judge. 28 U.S.C. §636(c)(2). Previously pending on this court's law and motion calendar for September 24, 2009, was the motion for summary judgment filed August 10, 2009, by defendants City of Davis, Bezuglov, Munoz, and Allen. Plaintiffs have filed an opposition.[1] Plaintiff Sergei Portnoy appeared in pro se. Defendants were represented by Susan De Nardo and Amie McTavish.

---

[1] The opposition does not meet the pleading requirements of Fed. R. Civ. P. 56 and E. D. Local Rule 56-260. It contains no statement of undisputed facts, supporting affidavits, or citation to evidentiary documents in support thereof. It also contains no memorandum of points and authorities.

1

## II. BACKGROUND

Plaintiffs Mr. and Mrs. Portnoy filed the amended complaint on September 18, 2008, pursuant to the Civil Rights Act, 42 U.S.C. § 1983, alleging that defendants City of Davis and three of its named police officers[2] violated plaintiffs' rights to be free from unreasonable searches, as provided by the Fourth Amendment. The amended complaint avers that on the afternoon of July 19, 2007, three Davis police officers entered plaintiffs' apartment at gunpoint and without a warrant after repeatedly knocking, grabbed, dragged and restrained Mrs. Portnoy, handcuffed and restrained Mr. Portnoy, inspected the upstairs where plaintiffs' children were located, with guns drawn, and then released plaintiffs and left the premises with the only explanation that "they were looking for a women who lived at this address" [Sic]. The amended complaint further alleges that, "after these actions of the police my wife began to loose appetite and weight, the oldest child began to stammer and youngest child did not sleep well and cryed at night. [¶] Actions of policemen left bruises on my body and scratches on my hands." [Sic].

The amended complaint also names in the caption state law claims of trespass, assault and battery, and intentional and negligent infliction of emotional distress.[3] Plaintiffs seek monetary damages.

## III. SUMMARY JUDGMENT STANDARDS UNDER RULE 56

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee note to 1963 amendment). Summary judgment is appropriate "if . . . there is no genuine issue as to any material fact, and . . . the moving party is entitled to judgment

---

[2] The amended complaint originally named a fourth officer, defendant Narr, however he is deceased and therefore no longer a party to this action.

[3] The caption also lists a claim for "Violation Human Rights Act;" however it is most likely a mischaracterization of a claim under the Civil Rights Act.

as a matter of law." Rule 56(c).  Disputed facts must be material (affecting the outcome of the suit under the governing law), and genuine (supported by evidence permitting a reasonable jury to return a favorable verdict).  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

The moving party:

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Rule 56(c)).

The moving party without the burden of proof at trial may rely "solely on the pleadings, depositions, answers to interrogatories, and admissions on file." <u>Id</u>. (citations omitted.)  That party need only point to the absence of a genuine material factual issue, and is not required to produce evidence negating the opponent's claim.  <u>Id</u>. at 323-24; <u>Lujan v. National Wildlife Fed'n</u>, 497 U.S. 871, 885, 110 S. Ct. 3177, 3187 (1990).

When the moving party meets its responsibility, the burden shifts to the opposing party.  <u>Matsushita</u>, 475 U.S. at 586, 106 S. Ct. at 1356.  The opposing party then must submit "significant probative evidence" on each element of his claims on which he bears the burden at trial.[4]  <u>Barnett v. Centoni</u>, 31 F.3d 813, 815 (9th Cir. 1994).  Unverified denials in pleadings are insufficient.  Neither can conclusory statements defeat a properly supported motion.  <u>Scott v. Rosenberg</u>, 702 F.2d 1263, 1271-72 (9th Cir. 1983).  Rather, specific facts in the form of affidavits or admissible discovery material must be submitted.  Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n.11.

\\\\\

---

[4] "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 322.

3

The opposing party need not conclusively establish any fact. To demonstrate a genuine dispute, however, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted). In other words, the evidence must demonstrate that a trial is required to resolve the parties' differing versions of the truth. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

The court believes the evidence of the opposing party, Anderson, 477 U.S. at 255, 106 S. Ct. at 2513, and draws all reasonable inferences in its favor, Matsushita, 475 U.S. at 587, 106 S. Ct. at1356. Nevertheless, inferences are not drawn out of the air, and the opposing party must produce a factual predicate from which to draw an inference. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985).

IV.   PRO SE STANDARDS

Plaintiffs' opposition to summary judgment is two pages in length and is merely a bullet point list of arguments. Plaintiffs have not provided declarations or responded to defendants' undisputed facts or presented their own statement of undisputed/disputed facts. Plaintiffs' opposition contains no exhibits or other evidence in support. Plaintiffs do not address the evidence cited in defendants' motion for summary judgment. The opposition contains only conclusory argument which claims that defendants' evidence is unreliable, yet for the most part does not counter the specific issues raised in defendants' brief. Plaintiffs have failed to tender any evidence of specific facts in the form of affidavits, and/or admissible discovery material.

The present opposition brings into focus the Ninth Circuit's conflicting rulings on analysis of pro se oppositions to summary judgment motions. The Ninth Circuit has stated that pro se litigants must follow the same rules of procedure that govern other litigants. King v. Atiyeh, 814 F.2d 565, 567 (9th Cir.1987). As a general rule for ordinary litigants, the judge does not have to scour the record in efforts to find evidence which might defeat summary judgment,

i.e., the litigant must supply the needed evidence *within the motion or opposition*. See Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1030 (9th Cir.2001) (stating the rule for represented parties: "Other circuits are not unanimous, but *Forsberg* is both binding on us and consistent with the majority view that the district court may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein."); but see Jones v. Blanas, 393 F.3d 918, 922-923 (9th Cir. 2004) ("[b]ecause Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones [admissible] contentions offered in motions and pleadings [signed under penalty of perjury].") It is difficult to square Jones with King because Jones clearly fashions a separate rule for pro se litigants in opposing summary judgment, and does away with the "same rules of procedure that govern other litigants."

> Moreover,
>
> A trial court can only consider admissible evidence in ruling on a motion for summary judgment. See Fed.R.Civ.P. 56(e); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir.1988). Authentication is a "condition precedent to admissibility," [] and this condition is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." [] Fed.R.Evid. 901(a). We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment. See Cristobal v. Siegel, 26 F.3d 1488, 1494 (9th Cir.1994); Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550-51 (9th Cir.1989); Beyene, 854 F.2d at 1182; Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir.1987); Hamilton v. Keystone Tankship Corp., 539 F.2d 684, 686(9th Cir.1976).

Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir.2002) (footnotes omitted). But see Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir.2003) (finding form of evidence unimportant; only substance matters, and as long as substantive evidence "could" be made use of at trial, it does not have to be admissible per se at summary judgment). The Ninth Circuit also permits sworn-to allegations of the complaint, Schroeder v. McDonald, 55 F.3d, 454, 460 (9th Cir. 1995), and seemingly almost any attachment thereto to be used to oppose the summary judgment because

5

the substance "could" conceivably be made admissible at trial.

The standards ultimately to be employed are important here. Taking defendants' facts as undisputed, because they were not formally disputed by plaintiffs by way of opposition declaration, exhibits or discovery, much less the required response to defendants' separate statement of undisputed facts, this is a close case on summary judgment, but one which should be adjudicated in defendants' favor. However, if the undersigned is compelled to become lawyer for the Portnoys, digging up every favorable fact which the record might otherwise divulge, and taking these newly established facts and Portnoy's factual argument at hearing as facts which "could be made admissible at trial," too many issues of fact, and gaps in the facts, exist to grant summary judgment. Defendants, understandably, point to that authority which would not permit the undersigned to do this.

The undersigned is frustrated at the lack of established standards, and part of this frustration was evident at hearing. However, for this case, the undersigned will have to choose one side of authority or the other; therefore, he will review the entire file for facts in favor of plaintiffs and without regard to the present admissibility of those facts.

V. UNDISPUTED FACTS[5]

Defendant Bezuglov was investigating a case regarding a burglarized automobile in which fingerprints were lifted and identified as belonging to "Jane Doe." Based on information from the Yolo County Probation Department on July 19, 2007, and the Woodland Police Department, Bezuglov identified Jane Doe's address as 739 West Lincoln Avenue, apartment 140, Woodland.[6] The officers later were informed that the correct address was 736 and not 739. Through a CLETS report, Bezuglov knew that Jane Doe was on searchable probation at

---

[5] Because plaintiffs have not submitted undisputed facts, or formally disputed defendants' version of the facts, the court has set forth those facts which cannot be reasonably disputed based on a review of the record as a whole.

[6] Bezuglov obtained these two pieces of information identifying Doe's address from a Ms. Sellers, Investigation Secretary for the Davis Police Department.

the time. On the way to the search with police detectives Allen, Munoz, and Narr, Bezuglov received information from the Woodland Police Department that their officers had previously contacted Jane Doe at this address one month earlier.[7]

On arrival at the front door to the apartment, officers Allen, Narr and Bezuglov went to the front door while Munoz went to the rear of the apartment. All officers were wearing shirts which stated "Police" on the front and back, and were wearing badges. The police knocked, and received a response from Mr. Portnoy in a loud voice, "I don't care if it's the cops, let them break the door!" After more knocking, Mrs. Portnoy opened the door. The detectives entered with their guns drawn. Defendants state that they did not threaten to shoot anyone. After the police entered the residence, Mr. Portnoy walked toward the kitchen. There was a block of knives on the counter. Out of concern for safety, Allen and Bezuglov handcuffed Mr. Portnoy and sat him down on a chair during the probation search. They permitted Mrs. Portnoy to stand by her husband during the search. She was not handcuffed. While Allen was with plaintiffs downstairs, detectives Narr and Bezuglov went upstairs. They saw no sign of Jane Doe so they returned downstairs, removed Mr. Portnoy's handcuffs and left the apartment. After they exited, they explained to Mrs. Portnoy that they had received information that a woman they had been searching for lived at this address. Mr. Portnoy yelled derogatory language at the officers, and they left. After returning to the Davis Police Department, the defendants learned for the first time that Jane Doe was in jail and no longer at the previously provided address.

VI.  DISCUSSION

    A.  Probation, Warrantless Searches and the Fourth Amendment

Pursuant to the Fourth Amendment,"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

---

[7] See discussion infra for further discussion of this fact.

and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " Pennsylvania v. Mimms, 434 U.S. 106, 108-09, 98 S.Ct. 330 (1977) (quoting Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868 (1968)).

A claim of unreasonable search may state a Fourth Amendment claim for violation of section 1983. See Robins v. Harum, 773 F.2d 1004 (9th Cir.1985) (holding that section 1983 claim based on violation of Fourth Amendment rights is viable if police search and seizure was unreasonable). Likewise, bad faith, illegal or false arrest claims may be cognizable under § 1983 for violating plaintiffs' Fourth Amendment rights. See Pierson v. Ray, 386 U.S. 547, 555-558, 87 S. Ct. 1213 (1967) (arrest without warrant or justification states 1983 claim for Fourth Amendment violation); Bretz v. Kelman, 773 F.2d 1026, 1031 (9th Cir. 1985).

In regard to a determination to conduct a probation search, when the object of the search is on searchable probation, reasonable suspicion is all that is required. United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001); United States v. Kincade, 379 F.3d 813, 861-62 (9th Cir. 2004). However, in determining to search a residence where the probationer is reportedly residing, the question of whether the probationer resides at that residence requires more than a suspicion that the probationer resides there. "[B]efore conducting a warrantless search pursuant to a parolee's[8] parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched." Motley v. Parks, 432 F.3d 1072, 1080 (9th Cir. 2005). "Nothing in the law justifies the [warrantless] entry into and search of a third person's house to search for the parolee." Id. at 1079. A probation officer has reasonable grounds to search a residence for evidence of a probation violation where it was listed with the probation office as the probationer's address. Shea v.

---

[8] Parolees and probationers are treated similarly in regard to residence searches. U.S. v. Davis, 932 F.2d 752, 758 (9th Cir. 1991).

Smith, 966 F.2d 127, 131 (3d Cir.1992).

   Cases finding probable cause to believe the probationer lived at the stated address usually do so where at least three of the following four patterns are present:

> (1) the probationer "gave [the officers] good reason to suspect that the [probationer] was using [the searched home] as his home base";
> (2) the probationer had a key to the searched residence;
> (3) the probationer (or someone close to him) admitted that he resided at the searched home; and
> (4) the probationer "did not appear to be residing at any address other than the one searched."

U.S. v. McAdoo, 2008 WL 682612 (C.D. Cal. 2008) (*citing* U.S. v. Howard, 447 F.3d 1257, 1266 (9th Cir. 2006) (compiling thirty years of case law to distill patterns, and finding officers must be reasonably certain they are at the "right" house and their belief must be based on "very strong facts").

   The overarching issue in this case is whether defendants had probable cause to believe that Jane Doe resided at the residence which was searched. However, there are two sub-issues within the larger issue; (1) the reasonableness of reliance on the information transmitted by the office secretary and Woodland authorities; and (2) the reasonableness of entry without identification of the subject of the probation search. Although the final analysis of probable cause to search at the residence at issue merge the two inquiries, it is best to initially break them out.

   1. <u>Reliability of Address</u>

   In this case it is undisputed that defendant officers ("defendants") conducted a warrantless probation search of plaintiffs' apartment, based on information obtained from two agencies, Yolo County Probation Department and the Woodland Police Department, indicating that probationer "Jane Doe" resided at the address searched, which happens to actually be the address where plaintiffs resided at the time of the search. (Bezuglov Decl., ¶ 6.) Officers were looking for Jane Doe as the prime suspect in connection with a vehicle burglary in which her

fingerprints were found inside the stolen vehicle.[9] The declaration of Detective Bezuglov relates that "on the way to the apartment, Detective Munoz confirmed with the Woodland Police Department that their officers had contacted 'Jane Doe' at that address approximately one month earlier." (Bezuglov Decl., ¶ 6.)

Defendants do not mention other important facts until their reply, after plaintiffs raise the issue, that the address for the search was originally stated to be 739 West Lincoln Ave., #140, but that defendants searched 736 West Lincoln Ave., #140, where plaintiffs resided.  In their reply defendants mention for the first time that they could not locate number 739 when they arrived at West Lincoln Avenue, but they made two phone calls wherein they were redirected by the Woodland Police Department to number 736 as the correct building number for Jane Doe. Munoz also called the Yolo County Probation Department at this time and confirmed number 736 as the correct address.  (Munoz Decl., ¶¶ 4-6.)

The amended complaint states that the Portnoys had lived at this address since July 15, 2006, or for 369 days,[10] (Am. Compl. at 3.) thereby making the relayed information very problematic.

Defendants state that they learned for the first time after returning from the search that Jane Doe was in jail. (Bezuglov Decl., ¶ 14.)  Mr. Portnoy testified that when he went to the Davis Police Department only *one hour* after the incident ended, the lieutenant who took the Portnoy's statement informed them that Jane Doe was in prison at that time. (S. Portnoy Decl., at 62.)  Defendants do not state how they learned this information, but it is disconcerting that they had current Yolo County Probation information, and yet did not know that Jane Doe was in jail. Also disconcerting is that they were able to find out within an hour after the search that Jane Doe

---

[9] Jane Doe also had a long criminal record which included burglary and petty theft. (Bezuglov Decl., ¶ 3.)

[10] The amended complaint is unverified; however, based on the pro se standards set forth *supra*, it and other inadmissible evidence will be considered herein.

was in jail, yet were unable to acquire this information prior to the search.

Defendants urge the court to consider the facts of Motley which they argue are similar. In that case also, a combined state and federal task force of officers relied on information obtained from the Los Angeles Police Department regarding a parolee's last known address and parole status. Motley, 432 F.3d at 1080. The address provided for the search was based on information developed within the month prior to the search. Id. at n. 6. One of the officers testified he had made contact with the parolee subject to the search at the address provided. Id. at 1080-81. Both the parolee and his grandmother confirmed that he lived at the address. One of the officers conducting the search testified that he independently knew the parolee was on parole. Id. at 1081. The officers conducting the search were not aware until the search was over that the parolee was in custody at the time of the search. Id. at 1076.

These facts may appear superficially similar to those in Motley; however, they are different in significant respects. The officer in Motley testified that he had made contact with the parolee at the address in question more than once. In addition, both the parolee and his grandmother confirmed that the parolee lived at the address. In this case, no defendant previously had made contact with Jane Doe at the address in question. Nor was this address independently verified by a relative of the parolee.

On the other hand, there is no rule that police officers involved in the search must personally query databases or personally make phone calls to relatives. It may be entirely appropriate to rely on competent office staff for such requests as: find me the address of Jane Doe. And, the ultimate issue here is not whether the information turned out to be correct in hindsight, but whether the officers reasonably relied on what they thought to be correct information. There is no direct evidence that defendants are fabricating their declaration in this respect, and the court is not so finding.

Nevertheless, in the absence of personal knowledge, the records checked must have some indicia of reliability, and this reliability must be made known to the court with

specific facts. It will not do to assume as a matter of law that a non-specific call to the "probation office" will result in the correct information being transmitted. The fact here that unrelated-to-Jane Doe parties lived at the searched address for over a year (with no evidence that Jane Doe resided with these people), and the fact that Jane Doe's correct whereabouts were so easily found upon return to the police department give rise to an inference that something in the address verification process was seriously amiss, and this possibility of error was, or should have been known to the police prior to the search. Indeed, the explanation letter to plaintiffs by the Davis Police Chief, attached to the amended complaint, something which could conceivably be made admissible at trial, itself referenced unspecified mistakes and other actions which could have been taken to avoid the error.

### 2. The Search

A parole or probation search does not permit an exception to the knock and announce requirement unless there are exigent circumstances or futility. Green v. Butler, 420 F.3d 689, 699 (7th Cir. 2005). The announcement of the purpose of the search here was important as the information submitted during this communication could have been highly probative of whether there was probable cause to believe that Jane Doe resided at that residence. It was, in essence, the last good opportunity to establish probable cause concerning the correctness of the search location, as probable cause had not been established if the situation is viewed most favorably towards plaintiffs. The officers, who had already been informed the initial address number given to them was incorrect, may well have determined that they were at the wrong house when questioning residents with a thick Russian accent. Cf. Motley at 1076, 1082. Because there are disputed facts whether officers announced their purpose when knocking at the door, summary judgment is inappropriate.

Once defendants arrived at the correct stated address for Jane Doe, it is undisputed that they knocked loudly and were wearing police uniforms and badges. What happened next is disputed based on the record as a whole. Defendants claim they announced they were the police

and stated they were there for a probation search. (Bezuglov Decl., ¶ 9.) Mrs. Portnoy's deposition transcript indicates her testimony that the officers yelled only, "open the door," and did not identify themselves as police. (E. Portnoy Dep. at 36-37.) Mr. Portnoy testified that the officers did identify themselves as police. (S. Portnoy Dep. at 56:3, 57.)

According to Mrs. Portnoy, she asked police more than once, "who do you want?" and "what do you want?" but they did not respond. (E. Portnoy Dep. at 38.) Defendants' facts do not mention these questions at all, but reference only Mr. Portnoy's statement, "I don't care if it's the cops, let them break the door!" which is an undisputed statement. Mrs. Portnoy then testified that she opened the door against her husband's wishes and the police "rushed" in with guns out. (Id. at 39:23, 35-36.) After the police entered the residence is when defendant Bezuglov states that he tried to explain to Mrs. Portnoy that they were there to conduct a probation search; however while attempting the explanation, he was interrupted. Bezuglov does not state how far he was able to get in his explanation; however, he concedes that he did not explain the reason for the search until after the search was completed. (E. Portnoy Decl., at 44; Bezuglov Decl. ¶ 12.) [11]

At this time, Bezuglov observed a male, later identified as Mr. Portnoy, walk toward the kitchen, where knives are usually kept. (Bezuglov Decl., ¶ 10.) Mr. Portnoy testified that he announced he was going to call 911, and then walked to the kitchen to call 911 because he did not know whether defendants were really police officers. (Portnoy Dep. at 69-70, 73, 65.) Mr. Portnoy explained at the hearing that the knives were on one end of the counter, and the phone was at the opposite end of the counter. He entered the kitchen on the end where the phone was, and explained that in order for him to reach the knives at that time, he would have had to

---

[11] Defendants assert that because they heard loud voices after they first knocked, they believed a domestic dispute, involving Jane Doe, may have been underway. The police do not assert that they had any such impression prior to knocking. And, loud voices (partly in Russian and partly in English discernable to the police after the knocking started) are much more probably the result of the surprise knocking as opposed to a simultaneously erupting domestic dispute.

crawl or jump across the entire length of the counter. Defendants assert that based on Mr. Portnoy's potential access to knives, they handcuffed him and sat him in a chair. Mr. Portnoy's explanation creates a question of fact whether handcuffing him was reasonable on the part of defendants.

There are no undisputed facts indicating that prior to the completion of the search, police ever stated they were looking for Jane Doe or answered Mrs. Portnoy's questions regarding who they were looking for, and defendants could not resolve these gaps at hearing. There are also no facts indicating whether Russian voices of the residents were consistent with a connection to Jane Doe, another missing piece of information which defendants could not explain at hearing. If Jane Doe was not known to be a Russian immigrant, then plaintiffs' Russian accents should have put defendants on notice that they might have the wrong address.[12]

### 3. Conclusion

In sum, none of the strong evidence establishing probable cause in Motley was present here. The method and actual source by which the Davis police office staff gathered the information to give to the police is unknown. The basis for the erroneous communication by Woodland authorities that someone had contact with Jane Doe at the residence in the recent past is unexplained. The ability to so quickly discover the error after the fact, and the inability to explain this error finding process to the court raises suspicion. Perhaps if more information were known about: the precise records relied upon, how those records were maintained, the precise communications known regarding the records check, and the precise reasons why the error was made, summary judgment would be appropriate . However, the court has not been presented with this information. In addition, accepting the Portnoys' evidence of the lack of meaningful communications at the door, as the undersigned must on summary judgment, the police did not

---

[12] The opposition states that Bezuglov's declaration originally named the probationer, "Jayme Moreland," but then changed the name to "Jane Doe." Plaintiffs present no evidence of this claim but under the current Ninth Circuit pro se standards, this information could conceivably be made admissible at trial.

attempt to beef up relatively weak proof-of-residence evidence of having the correct evidence. All of these inconsistencies and disputes diminish probable cause and create issues which cannot justify summary judgment.

B. Monell Liability (City of Davis)

Defendants argue that plaintiffs have not alleged or provided evidence of an unconstitutional custom, practice or policy by the City of Davis.

"[L]ocal governments, like any other § 1983 'person,' . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell v. Department of Social Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2036 (1978). "[P]laintiff must allege that the action inflicting injury flowed from either an explicitly adopted or a tacitly authorized city policy. Monell, at 690-91, 98 S.Ct. at 2035-36; Harris v. City of Roseburg, 664 F.2d 1121, 1130, 1338 (9th Cir.1981) ("'Official policy' within the meaning of Monell [encompasses situations] where a municipality 'impliedly or tacitly authorized, approved, or encouraged' illegal conduct by its police officers.'") (quoting Turpin v. Mailet, 619 F.2d 196, 201 (2nd Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577 (1980))." Gibson v. U.S., 781 F.2d 1334, 1337-1338 (9th Cir. 1986); see also, Ortez v. Washington Cty., 88 F.3d 804, 811 (9th Cir. 1996). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-824, 105 S.Ct. 2427, 2436 (1985).

"'[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Collins v. City of Harker Heights, 503 U.S. 115, 123, 112 S.Ct. 1061, 1067 (1992), quoting in Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197 (1989). Municipal liability can be established either by an unconstitutional policy, or by a policy or custom of failing to train employees where such failure causes a violation of constitutional rights demonstrating deliberate indifference. Id.

The complaint does not allege an unconstitutional policy, custom or practice by the City of Davis, and plaintiffs' opposition makes no argument on this issue. Therefore, summary judgment should be granted to this defendant.

C. Qualified Immunity

Defendants argue that they are entitled to qualified immunity. In resolving a claim for qualified immunity the court addresses two questions: (1) whether the facts, when taken in the light most favorable to plaintiff, demonstrate that the officer's actions violated a constitutional right and (2) whether a reasonable officer could have believed that his conduct was lawful, in light of clearly established law and the information the officer possessed. Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034 (1987). See also Saucier v. Katz, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (finding that qualified immunity will attach if "the officer's mistake as to what the law requires is reasonable"). Although the Supreme Court at one time mandated that lower courts consider these two questions in the order just presented, more recently the Supreme Court announced that it is within the lower courts' discretion to address these questions in the order that makes the most sense given the circumstances of the case. Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808, ____ (2009).

If there are disputed facts, the court adopts the version of the non-moving party to set the situation for which qualified immunity will be analyzed. Millender v. County of Los Angeles, 564 F.3d 1143, 1148 (9th Cir. 2009).

However, the issues facing the court do not involve the clarity of the law, but the clarity of the factual situation facing defendants in obtaining probable cause to believe that Jane Doe resided at the residence searched. In such a situation, the analysis germane to summary judgment on the merits is nearly identical to the analysis on qualified immunity. Substituting the word "search" in lieu of the word "arrest" in the qualified immunity case of Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534, 537 (1991), one sees that the undersigned's opinion on the identity of analysis is correct:

> Under settled law, [the police officers] are entitled to immunity if a reasonable officer could have believed that probable cause existed to [search]. Probable cause existed if "at the moment the [search] was made... the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" [that probable cause to search at this residence existed].

As discussed above, the court cannot find *on this record* that probable cause to search for Jane Doe at plaintiffs' residence was reasonable to an ordinary person of prudence as a matter of law. Therefore, qualified immunity is not available to award judgment in favor of defendants.

D. State Law Claims

The amended complaint lists state law claims for trespass, assault and battery, and intentional and negligent infliction of emotional distress in the caption only. Defendants concede that the trespass, battery standards under state law mirror those of the Fourth Amendment. Thus, those claims must stand for now. Under the liberal pro se standards, the intentional infliction of emotional distress claim cannot be dismissed. While defendants are correct that there is no independent tort of negligent infliction of emotional distress, Delfino v. Agilent Technologies, Inc, 145 Cal. App. 4th 790, 818 (2006), that case held that the theory was a valid part of the law of negligence. Finally, plaintiffs' non-elaborated "human rights" claim is subsumed within the other claims and will be dismissed.

\\\\\

## V. CONCLUSION

Accordingly, given the standards available to pro se plaintiffs on summary judgment, at least in one line of authority, IT IS HEREBY ORDERED that the individual defendants' August 10, 2009 summary judgment motion (Docket # 26) is denied in regard to the Fourth Amendment claim, and denied on the state law claims of trespass, assault and battery, and intentional and negligent infliction of emotional distress. The "human rights" claim is dismissed. Defendant City of Davis is granted summary judgment on the Fourth Amendment claim, but denied as to all state claims except for the "human rights" claim dismissed above.

DATED: October 9, 2009

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:076/Portnoy1366.msj